# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**JONATHAN HEARD**

**CR. NO. 16-119-JWD-RLB**

**JUDGE JOHN W. deGRAVELLES**

## RULING AND ORDER

### I.     INTRODUCTION

Before the Court is the Motion to Suppress (**Doc. 18**), filed by Defendant Jonathan Heard ("Defendant"), which is opposed by the Government (**Doc. 20**). The Court held an evidentiary hearing on March 22, 2017. (**Docs. 22, 25**.) Defendant and the Government filed Post-Hearing Memoranda (**Docs. 26** and **30**, respectively). After careful consideration of the law, the facts of this case, and the parties' arguments, for the reasons set forth below, Defendant's Motion to Suppress (**Doc. 18**) is **DENIED**.

### II.     FACTUAL BACKGROUND

At approximately 12:11 AM on the morning of September 9, 2016, and again at 12:12 AM, the BRPD received separate telephone calls from a man, later identified as Jackie Ross, who reported that another man had pointed a gun at him.[1] (Doc. 25 at 18, 20.) In the first call, Ross described a man wielding a gun as a tall male with a cap on, wearing a blue shirt and blue-jean shorts, and that he was accompanied by a female who was wearing a long dress. (Docs. 18-1 at 1; 20 at 1—2.) After BRPD dispatched Officers J. Stewart and Blaine Dupuy Wilkes to the

---

[1] Prior to the hearing, there had been some disagreement between the parties as to whether these calls were made late on September 8, 2016 or in the early morning hours of September 9, 2016. (*See* Docs. 18-1 at 1, 20 at 1.) However, at the hearing, Officer Dupuy, reading from BRPD records, confirmed that the above-stated times are when the calls actually occurred.

1

scene,[2] BRPD received a second call from Ross, this time Ross stated that the man waving a gun around was a "tall skinny black male wearing a blue shirt and blue jeans, and that he was with a female with a long dress." (Doc. 18-1 at 1 (internal quotation marks omitted).) In only one of the calls, did Ross allegedly report that his assailant was bald. (Doc. 25 at 18.)

After Officers Stewart and Wilkes arrived at the area, they were informed by one or more homeless persons that the man with the gun was walking down St. Vincent DePaul. (Docs. 18-1 at 2, 20 at 2.) At approximately 12:25 AM, officers located Defendant, a tall, thin, black male, walking down St. Vincent DePaul with his girlfriend; he was wearing a blue shirt and blue jeans or blue jean shorts,[3] and his girlfriend was wearing a long dress. (Docs. 18-1 at 2, 20 at 2; 25 at 20.) When Defendant saw the officers approach, he allegedly turned away from them briefly and threw something on the ground, which the officers later recovered and identified as a .380 caliber handgun. (Docs. 18-1 at 2, 20 at 2.) The officers searched Defendant and found three rounds of .380 caliber ammunition in his pocket. (Docs. 18-1 at 2, 20 at 2.) The officers advised Defendant of his *Miranda* rights, and he indicated he understood. (Doc. 20 at 2—3.) When questioned about the handgun, Defendant denied having it on his person. (*Id.* at 3.)

The officers placed Defendant in the back of a patrol car and proceeded toward the BRPD station. On the way to the station, a black male, who subsequently identified himself as Ross, flagged down the car to speak with the officers. (Docs. 18-1 at 2, 20 at 3.) The officers stepped outside the car to speak with Ross. According to the Government, Ross stated that he knew Defendant and referred to him as "that mother****** Heard" and that Defendant "is always in the area harassing and threatening people." (Doc. 20 at 3 (internal quotation marks omitted).) The Government further alleges that when asked to describe the gun, Ross responded

---

[2] Defendant initially refers to Stewart as "Steward" but later in his motion refers to him as "Stewart".
[3] According to Defendant, he was wearing blue jeans (Doc. 18-1 at 2); the United States, however, alleges he was wearing blue jean shorts. (Doc. 20 at 2.)

that "it was a small gun, possibly a .380, 22 or a 25" and Ross was also able to identify Defendant's girlfriend as the woman in the long dress. (Doc. 20 at 3.) It was only after Ross made these identifications that the officers rolled down the backseat window, illuminated the backseat with a flashlight, and asked Ross whether the man in the backseat was the man who pointed a gun at him, to which Ross emphatically responded in the affirmative. (*Id.*)

Defendant, however, claims that Ross did not identify Defendant as the assailant until after he observed Defendant in the backseat of the patrol car. (Doc. 18-1 at 2.) He concedes that Ross was able to describe the gun as a small gun and that he was able to identify it as possibly a .380, a 22 or 25. (*Id.*) He further admits that Ross was able to provide a description of his assailant, specifically that "he was 'a skinny black male with blue shirt and blue jeans and that he was with a female." (*Id.*)

A hearing on this matter was held on March 22, 2017. (Docs. 22, 25.) Ross did not appear in court to testify. Officer Dupuy stated that he was unable to locate Ross to request his presence in Court.[4] (Doc. 25 at 121.)

### III. DISCUSSION

#### a. Standard

A suppression hearing allows the court to make a preliminary determination regarding the admissibility of certain evidence allegedly obtained in violation of the defendant's constitutional rights under the Fourth Amendment. *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). The proponent of a motion to suppress bears the burden of establishing by a preponderance of the evidence that the evidence at issue was obtained in violation of his

---

[4] Ross (and Defendant) are both homeless. Officer Dupuy stated at the hearing that he has observed a trend of homeless individuals purchasing prepaid cellular phones and disposing of them after using all of the available minutes on the phone. (Doc. 25 at 121.) Thus, the number the officers had on file for Ross was out of service and they were unable to otherwise locate him to advise him his presence would be required in court. He was never served with a subpoena.

[constitutional] rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)); *see also United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

The Supreme Court has held that the Due Process Clause of the Fifth Amendment guarantees criminal defendants the right to exclude identification testimony that results from unnecessarily suggestive procedures that are conducive to mistaken identification. *See Perry v. New Hampshire*, 565 U.S. 228, 239 (2012); *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Courts are instructed to apply a two-pronged test to determine the admissibility of an out-of-court identification. First, a court must determine whether the pretrial identification procedure was impermissibly suggestive. *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972); *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997). If the Court determines the identification procedure was not impermissibly suggestive, it may end its analysis. *See United States v. Honer*, 225 F.3d 549, 553 (5th Cir. 2000); *Livingston*, 107 F.3d at 309. However, if the Court finds the procedure was impermissibly suggestive, it must then determine "whether based on the totality of the circumstances, the [procedure] posed a very substantial likelihood of irreparable misidentification." *Honer*, 225 F.3d at 553 (citation omitted). The Supreme Court has set forth five factors that bear on the likelihood of irreparable misidentification: (1) the witness's opportunity to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated when making the identification; and (5) the time between the crime and the identification. *Biggers*, 409 U.S. at 199-200; *see also United States v. Burbridge*, 252 F.3d 775, 780 (5th Cir. 2001).

### b. Parties' Arguments

#### i. Defendant's Arguments

Defendant argues that Ross's identification of him, "while he was under arrest, alone, in the back of a patrol car is an impermissibly suggestive identification." (Doc. 18-1 at 5.) Citing Supreme Court jurisprudence, he asserts that the inquiry of whether a show-up identification was impermissibly suggestive must be evaluated on a case-by-case basis in light of the unique facts presented therein. (*Id.* (citing *Biggers*, 409 U.S. at 196).) Defendant argues that the fact that he was in the back of a patrol car, in and of itself, renders Ross's identification unduly suggestive "because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." (*Id.*)

Defendant argues the suggestiveness of the identification was exacerbated by the fact he was the sole individual in the back of the cop car; there was no pressing necessity requiring an immediate identification, therefore the proper course of action should have been to bring Ross down to the station for a proper lineup. (*Id.* at 5—6.) Citing Supreme Court jurisprudence, Defendant argues "that the 'practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.'" (*Id.* at 6 (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).)

Defendant attempts to distinguish the instant case from that in *Perry*, in which the Supreme Court held that due process is not violated where law enforcement officials do not purposefully arrange the suggestive circumstances behind the identification. (Doc. 18-1 at 6—8.) He argues "[t]he fact that [Defendant] was under arrest, and in the custody and control of Officer Stewart when the witness identification occurred, means that the identification in this case was arranged by law enforcement for purposes of analysis under *Perry*." (*Id.*) Unlike in *Perry*, where

5

the defendant was engaged in a consensual encounter with officers and was not under arrest at the time the victim made the arguably suggestive identification, here Defendant had already been handcuffed and placed in the back of a patrol car and completely under the control of Officer Stewart; Defendant could not protest Ross approaching the vehicle, or to Stewart flashing a light on Defendant for identification. (*Id.* at 7.) Thus, according to Defendant, the "unnecessarily suggestive circumstances [were] arranged by law enforcement." (*Id.* (citing *Perry*, 565 U.S. at 248).) He argues that according to the police report, it was only after Officer Stewart prodded Ross about his assailant's identity that Ross noticed Defendant in the car and made the identification, which, according to Defendant, takes the instant case beyond the purview of *Perry*.

Defendant asserts that the case at bar is akin to a case decided by the United States Court of Appeals for the Third Circuit, *United States v. Shavers*, 693 F.3d 363, 369 (3d Cir. 2012). In *Shavers*, two suspects were apprehended following an armed robbery; after being placed in the back of a patrol car, officers asked two of the victims whether the men in the backseat of the car were the assailants, to which the victims replied in the affirmative. The Third Circuit found the show-up identifications were unduly suggestive. *Shavers*, 693 F.3d at 382. Defendant insists the instant case more closely resembles *Shavers* than *Perry*, and urges the Court to follow the logic and holding of *Shavers*. (Doc. 18-1 at 7—8.)

Finally, Defendant argues that the *Biggers* factors all weigh in favor of suppressing Ross's identification because they all suggest there was "a substantial likelihood of misidentification by the witness in this case." (*Id.* at 8.) First, Defendant argues the police reports give no indication whether Ross "had a great opportunity to view the person wielding the gun, or how attentive Ross was when he viewed the person wielding the gun." (*Id.*) Although Ross

the defendant was engaged in a consensual encounter with officers and was not under arrest at the time the victim made the arguably suggestive identification, here Defendant had already been handcuffed and placed in the back of a patrol car and completely under the control of Officer Stewart; Defendant could not protest Ross approaching the vehicle, or to Stewart flashing a light on Defendant for identification. (*Id.* at 7.) Thus, according to Defendant, the "unnecessarily suggestive circumstances [were] arranged by law enforcement." (*Id.* (citing *Perry*, 565 U.S. at 248).) He argues that according to the police report, it was only after Officer Stewart prodded Ross about his assailant's identity that Ross noticed Defendant in the car and made the identification, which, according to Defendant, takes the instant case beyond the purview of *Perry*.

Defendant asserts that the case at bar is akin to a case decided by the United States Court of Appeals for the Third Circuit, *United States v. Shavers*, 693 F.3d 363, 369 (3d Cir. 2012). In *Shavers*, two suspects were apprehended following an armed robbery; after being placed in the back of a patrol car, officers asked two of the victims whether the men in the backseat of the car were the assailants, to which the victims replied in the affirmative. The Third Circuit found the show-up identifications were unduly suggestive. *Shavers*, 693 F.3d at 382. Defendant insists the instant case more closely resembles *Shavers* than *Perry*, and urges the Court to follow the logic and holding of *Shavers*. (Doc. 18-1 at 7—8.)

Finally, Defendant argues that the *Biggers* factors all weigh in favor of suppressing Ross's identification because they all suggest there was "a substantial likelihood of misidentification by the witness in this case." (*Id.* at 8.) First, Defendant argues the police reports give no indication whether Ross "had a great opportunity to view the person wielding the gun, or how attentive Ross was when he viewed the person wielding the gun." (*Id.*) Although Ross

provided officers with a detailed description of the clothes the assailant was wearing, Defendant argues he failed to provide any identifying characteristics about the assailant himself. (*Id.*) Moreover, Defendant argues that in each of his phone calls to BRPD, Ross gave conflicting accounts of the clothes the assailant wore; in one, he claimed the assailant was wearing blue jeans, in the other, he claimed he was wearing blue jean shorts. (*Id.*) Further, in one account, Ross claimed the assailant was wearing a hat, but Defendant was not wearing a hat when officers apprehended him. (*Id.*) Defendant also argues that "[t]he reports [] do not detail the level of certainty that Ross displayed when he identified [Defendant] in the back of the police car" nor did it indicate the amount of time that elapsed between Ross's call to BRPD and the time Ross identified Defendant. (*Id.*) Accordingly, under *Biggers*, Defendant avers "the facts presented in Officer Stewart's report create a substantial likelihood of misidentification" and therefore Ross's identification of Defendant should be suppressed from trial. (*Id.* at 8—9.)

In his post-hearing memorandum, Defendant reasserts many of the same arguments he raised in the memorandum in support of his motion to suppress. (*See generally*, Doc. 26.) He also emphasizes the fact that the Court was unable to evaluate the reliability of Ross's identification because Ross did not testify at the hearing, as officers were unable to locate him. (*Id.* at 9.) Accordingly, he argues that this failure to locate Ross to obtain his testimony erodes whatever reliability the identification may have had. (*Id.*)

### ii. The Government's Arguments

The Government insists the eyewitness identification in this case, which occurred less than one hour after the incident between Ross and his assailant occurred, was not impermissibly suggestive. (Doc. 20 at 4.) Further, the Government argues that because Ross knew Defendant

and was familiar with him, and because Defendant had just pointed a gun to Ross's head during a face-to-face altercation, Ross's identification is reliable. (*Id.*)

The Government maintains the procedures utilized in this case were not so impermissibly suggestive so as to warrant suppression of the identification because it did not "give rise to a very substantial likelihood of irreparable misidentification." (*Id.* at 5.) In support, the Government argues there is no categorical ban on allowing a witness to view a suspect alone in a "one-man showup" if the show-up occurs in close temporal proximity to the alleged criminal activity. (*Id.* (quoting *Bates v. United States*, 405 F.2d 1104, 1106 (D.C. Cir. 1968)).) Additionally, the Government claims that "the situation the police were presented on the [morning] of September [9], 2016 dictated how they proceeded with the victim identification." (*Id.*) Specifically, the arresting officers did not know the identity of the victim when they apprehended Defendant; Ross approached the patrol car as they were on the way to the station, and it was only after the officers left the patrol car to speak with Ross that they learned he was the victim in this case. (*Id.*) When the officers exited the car to speak with Ross, Ross was not able to view Defendant in the backseat of the patrol car, but he nonetheless identified his assailant by name, indicating he was familiar with "Heard," the man who pointed the gun at him. (*Id.*) It was only after Ross gave a description of Defendant's appearance and positively identified his girlfriend that the officers rolled down the backseat window to allow Ross to positively identify Defendant. (*Id.* at 5—6.) According to the Government, Ross "emphatically identified" Defendant as his assailant, and because this identification occurred within one hour of the incident, "the chances of misidentification were minimal." (*Id.* at 6 (citing *Elliot v. Beto*, 474 F.2d 856, 857 (5th Cir. 1973)).)

The Government further asserts that under the totality of the circumstances, and under each of the individual *Biggers* factors, the identification was reliable. (*Id.*) With regard to the first *Biggers* factor, the Government asserts that Ross "had ample opportunity to view the defendant up close, in person" and Ross was standing close enough to his assailant to have a gun pointed at his head and for the assailant to threaten to kill him if he touched the assailant's girlfriend. (*Id.* at 6—7.) Moreover, Ross knew Defendant prior to this incident, and he identified him by name to the investigating officers. (*Id.* at 7.)

With regard to the second factor, the Government asserts it also weighs in favor of denial of Defendant's motion because Ross "had a high degree of attention because of the close proximity to the defendant, and the fact that a gun was pointed at his head. The victim was even able to correctly describe the gun to police, accurately describing it as 'a small gun, possibly a .380, 22, or a 25.'" (*Id.*) The Government asserts that accurate identification of the type of firearm used in the incident is relevant to the second factor. (*Id.* (citing *Shavers*, 693 F.3d at 385).)

Turning to the third factor, the Government again alleges this weighs in favor of denial of Defendant's motion because Ross gave an accurate description of the clothes both Defendant and his girlfriend were wearing over the telephone, and again when the officers spoke to Ross in person before rolling down the window of the patrol car for Ross to identify Defendant. (*Id.*) The Government asserts that similar descriptions were sufficient to deem the identification reliable. (*Id.* (citing *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997)).)

Considering the fourth factor, the Government argues this too weighs in favor of a finding that the identification was reliable because Ross "did not show any hesitation when

identifying the defendant as the subject. He was emphatic about 'Heard' being the man who accosted him, and affirmed his identification to police several times." (*Id.* at 8.)

Finally, with respect to the fifth factor, the Government asserts that the time between the commission of the crime and the identification, which was less than an hour, "is short enough to diminish the substantial likelihood of misidentification." (*Id.* (citing *United States v. Ortega-Urquidi*, 420 Fed. App'x 305, 308 (5th Cir. 2011); *United States v. Moody*, 564 F.3d 754, 763 (5th Cir. 2009); *Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006)).) In light of the foregoing, the Government submits that the in-person identification of Defendant was reliable, and therefore, even if the Court finds it was unnecessarily suggestive, it should nonetheless be permitted to go before the jury. (*Id.*)

In its post-hearing memorandum, the Government reasserts many of the arguments it made in its opposition to Defendant's motion. (*See generally*, Doc. 30.) It insists that "the procedures used by police were necessary under the circumstance" (i.e. "the potential threat of serious bodily harm") and thus, even if the officers did, in fact, arrange the show-up after being flagged down by Ross, their actions were justified. (*Id.* at 3.) It also reminds the Court that despite Defendant's efforts to place the onus on the Government, Defendant is the one who bears the burden on a motion to suppress. (*Id.* at 1—2.)

### c. Analysis

The Due Process Clause safeguards against the use of evidence obtained from impermissibly suggestive identification procedures. *United States v. Moody*, 564 F.3d 754, 762 (5th Cir. 2009)(quoting *United States v. Guidry*, 406 F.3d 314, 319 (5th Cir. 2005)(internal citation omitted)). As noted above (*see supra* p. 4) when the movant seeks to suppress an out-of-court identification on the grounds that it was overly suggestive, Courts are instructed to evaluate

the reliability of the identification under a totality of the circumstances analysis, and are to be guided by consideration of the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199—200; see also *Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006)(citing *Biggers*).

The above-mentioned factors allow the courts to decide, "on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S. at 239. The relevant inquiry is always the reliability of the identification, and only "[w]here the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Id.* at 239 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). Even where there is a suggestion of police misconduct, if the evidence is nevertheless reliable and admissible in all other respects, it should be submitted to the jury. *Id.*

In *Perry*, the challenged identification was not procured as a result of police misconduct; rather, after a series of car burglaries in an apartment building parking lot, police officers requested the defendant remain in the parking lot to speak with them, but they did not place the defendant under arrest or otherwise detain him involuntarily. *Id.* at 234. At the same time, another officer went up into the apartment of one of the witnesses, and while in her apartment, the witness walked over to her window, saw the defendant in the parking lot next to the officers, and announced he was the burglar. *Id.* Approximately one month later, investigators showed the victim a photographic lineup with the defendant's photo, and she was unable to identify him. *Id.*

11

at 234. The Supreme Court found that under these circumstances, the defendant's due process rights were not violated because the circumstances, although suggestive, were not purposefully arranged by police or otherwise derived from improper police conduct. *Id.* at 241. In so holding, the Court rejected the defendant's contention that where the circumstances were unduly suggestive, and that due process was implicated regardless of whether or not "law enforcement was responsible for creating the suggestive circumstances that marred the identification." *Id.* at 241. The Court found that such argument "removed [its] statement in *Brathwaite* from its mooring" because "the *Brathwaite* Court's reference to reliability appears in a portion of the opinion concerning the appropriate remedy *when the police use an unnecessarily suggestive identification procedure*." *Id.* at 241 (emphasis original).

The Fifth Circuit has pronounced that courts are to utilize a two-step test to determine the admissibility of an allegedly impermissibly suggestive identification. First, the court must "determine whether the identification procedure was impermiss[ibly] suggestive, and second, [the court must] ask whether the procedure posed a 'very substantial likelihood of irreparable misidentification.'" *Moody*, 564 F.3d at 762 (quoting *Guidry*, 406 F.3d at 319). Only where both inquiries are answered in the affirmative must the court suppress the identification from trial. *Id.* (quoting *Guidry*, 406 F.3d at 319). The constitutionality and admissibility of an identification is a mixed question of law and fact. *Id.* (quoting *Guidry*, 406 F.3d at 319). "The linchpin of the admissibility inquiry is whether the identification was *reliable*." *United States v. Delgado*, 364 Fed. App'x 876, 879 (5th Cir. 2010) (citing *Brathwaite*, 432 U.S. at 114) (emphasis added).

The practice of showing suspects singly (as opposed to in a lineup) to witnesses for the purpose of identification is a widely-condemned practice. *Id.* (quoting *Allen v. Estelle*, 586 F.2d 1108, 1112 (5th Cir. 1978)). However, even where an out-of-court identification procedure is

12

deemed impermissibly suggestive in violation of a defendant's due process right, the court need not suppress the identification if, under the totality of the circumstances, it was reliable. *Id.* (citing *Amador v. Quarterman*, 458 F.3d 397, 414 (5th Cir. 2006)). An identification is considered reliable so long as "the identification procedures did not pose 'a substantial likelihood of irreparable misidentification[.]'" *Id.* (citing *Amador*, 458 F.3d at 414).

Turning to the facts of this case, as an initial matter, the concerns the Supreme Court elucidated in *Perry* and *Braithwaite* are simply not present here. Defendant concedes that the police did not seek out Ross; rather, he approached them completely of his own volition. The arresting officers did not take any affirmative steps to purposefully catch his attention, and Defendant admits as much. While the Court could end its analysis here and deny Defendant's motion, (*see Perry*, 565 U.S. at 241 (explaining that a key premise in *Braithwaite* was that a "primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances, the Court said, is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place… This deterrence rational is inapposite in cases, like Perry's, in which the police engaged in no improper conduct.")), the Court finds that the unique circumstances of this case require further consideration to ensure a proper and just result. Specifically, although the police officers did not deliberately orchestrate the single lineup at issue here, they nevertheless opted to proceed with the identification while Defendant was seated in the backseat of the patrol car, rather than waiting to take him to the station for a proper lineup. Thus, while the officers did not affirmatively seek out the victim to allow him to identify Defendant through a one-man show-up, there is enough room for debate regarding the propriety of the arresting officers' decision to warrant further analysis.

Accordingly, the Court must evaluate the factors promulgated by the *Biggers* Court to determine whether Ross's identification of Defendant was impermissibly suggestive or posed a substantial likelihood of misidentification, and thus warrants suppression. For the reasons stated below, the Court finds that each of the five *Biggers* factors weigh in favor of denial of Defendant's motion.

First, Ross had ample opportunity to view Defendant at the time of the crime. He allegedly told officers that Defendant was attempting to instigate a fight between his girlfriend and Ross's girlfriend, and when Ross attempted to intervene, Defendant held a gun to his head and threatened to kill him. (Doc. 20 at 3.) This up-close and intense exchange between Ross and Defendant gave Ross a sufficient opportunity to observe Defendant at the time of the offense.

The second factor evaluates the witness's degree of attention and the third factor examines the accuracy of the witness' prior description of the suspect. Here, Ross called BRPD on two separate occasions immediately following his interaction with Defendant. He provided detailed descriptions to the dispatcher about the build of Defendant and the clothes that both he and his girlfriend were wearing. While Defendant argues that the descriptions Ross provided were inconsistent, the Court does not find the distinction between "blue jeans" and "blue jean shorts" to be particularly meaningful. Additionally, a description of a man as "bald" and as "wearing a cap" is not necessarily inconsistent with one another. Moreover, when he spoke with the officers, Ross was able to describe the gun Defendant used with reasonable certainty, advising it was a small handgun, either a .380, a 22 or a 25. (*Id.*) In reality, Defendant wielded a .380 caliber pistol. This degree of attention and level of accuracy in description of both the garb of Defendant and his girlfriend and the weapon which he had indicates that the second and third *Biggers* factors weighs against suppression.

The fourth factor considers the level of certainty the witness demonstrates at the confrontation. In this case, Ross allegedly identified Defendant by name, and advised that he knew "that mother****** Heard" before the incident that is the subject of this motion. (Doc. 20 at 3.) According to the Government, Ross "emphatically insisted" Defendant was his assailant after the officers rolled down the back window to reveal Defendant in the backseat.[5] Ross's high degree of certainty, coupled with his alleged prior familiarity with Defendant, weighs in favor of denial of suppression. Finally, the last *Biggers* factor asks the length of time between the incident and the identification. In this case, the identification took place within an hour of the incident. This strongly weighs in favor of denial of Defendant's motion.

Moreover, the case on which Defendant relies here, *United States v. Shavers*, 693 F.3d 363 (3d Cir. 2012), *vacated on other grounds by Shavers v. United States*, 133 S. Ct. 2877 (2013), actually supports the Court's conclusion. In *Shavers*, the defendants robbed an underground speakeasy; the officers apprehended the defendants down the street and brought them back to the speakeasy for witnesses to identify them as the perpetrators. 693 F.3d at 369, 370. Although the Third Circuit found that the defendants' identifications were unnecessarily suggestive, it nonetheless found "their presentation to the jury was still appropriate because the circumstances did not create a substantial risk of misidentification." *Id.* at 383. Applying the *Biggers* factors to the facts of the case, the Third Circuit concluded that notwithstanding the unnecessarily suggestive police tactics utilized to procure the identification, the identification was nonetheless reliable under the totality of the circumstances because it "did not present a substantial likelihood of misidentification", and it was therefore appropriate for the jury's consideration. *Id.* at 385.

---

[5] While Ross was not present to testify at the hearing, the Court found the officer's description of Ross's statements and actions to be credible.

In sum, the Court takes the following view of the facts presented in this case: while Ross's description of Defendant was fairly accurate, it varied somewhat between each 911 call. However, Ross remained unwavering in his description of the small handgun his assailant brandished, and his description proved consistent with the ammunition found on Defendant's person, and with the gun the arresting officers recovered nearby. Accordingly, the Court finds that Ross's description was reliable. Although a proper lineup at the police station would have unquestionably alleviated any suggestiveness caused by the show-up in the back of the patrol car, exigent circumstances existed—namely, that an individual was brandishing a gun and threatening serious bodily harm to another—that justified the identification. The Court also gives considerable weight to the fact that, unlike other cases cited by Defendant, here, the officers did not seek out the victim for a suggestive identification of Defendant; Ross flagged down the officers while they were riding in their patrol car and provided them with a description of his assailant. There is a significant difference between the cases in which the arresting officers took affirmative steps to create a situation that resulted in an impermissibly suggestive lineup and what transpired in this case. In light of the foregoing, under these specific circumstances, there is little doubt that there was no substantial likelihood of misidentification here, and therefore suppression of the identification is not warranted.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Suppress (Doc. 20) is **DENIED**.

Signed in Baton Rouge, Louisiana, on June 2, 2017.

**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**